**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| In re:<br><br>Christopher D. Gistis,<br><br>Debtor | Chapter 7<br>Case No. 18-10710 |

**MEMORANDUM OF DECISION**

The Trustee filed a motion asking the Court to impose sanctions on Jeffrey P. White, Esq. under 11 U.S.C. § 707(b)(4) and Fed. R. Bankr. P. 9011 [Dkt. No. 28] (the "Motion"). The evidence adduced at the hearing on the Motion leads to one inescapable conclusion: Mr. White did not meet the standards prescribed by section 707(b)(4) and Rule 9011 when he prepared and filed Schedule C in this case. As for the other shortcomings alleged by the Trustee, although the Court agrees that Mr. White should have been more careful, the processes employed were not so deficient as to run afoul of section 707(b)(4) and Rule 9011.

**FACTUAL AND PROCEDURAL HISTORY**

During the early 1980s, the Debtor lived in a multi-unit property in Westbrook, Maine (the "Property"). In 1985, the Debtor moved to the Boothbay region where he lived until 2019, when he moved to Saco. The Debtor bought the Property from his mother in 2003, but she continued to live there until 2005. The Debtor then remodeled the Property and rented it out to tenants. The Debtor's daughter lived at the Property for about a year, from 2009 to 2010. The Debtor granted a mortgage on the Property to secure his obligations under a promissory note; he ceased making payments under the note in 2013.

While living in the Boothbay region, the Debtor operated a restaurant. That venture ceased in 2016, when he became disabled and unable to work full time. After the restaurant

closed, he put the restaurant equipment in storage.  At some point, the Debtor experienced financial difficulties and sought assistance with a bankruptcy filing.

In early 2017, the Debtor learned of Mr. White's services online and spoke with him on the telephone.  Mr. White then mailed the Debtor a bankruptcy questionnaire for him to complete in advance of a meeting.  On that questionnaire, the Debtor indicated that he had no dependents, no executory contracts or unexpired leases, and no encumbered property that he wanted to retain.  He also disclosed his interest in the Property.  In mid-2017, the Debtor met with Mr. White in person.  During that meeting, Mr. White made several handwritten notes on the bankruptcy questionnaire next to the entries regarding the Property, presented here in no particular order: (1) "intent?"; (2) "LeT GO"; (3) "Keep"; and (4) "?".

During their initial consultation, Mr. White explained how bankruptcy worked and the differences between chapter 7 and chapter 13.  The Debtor indicated a preference for chapter 7.  Mr. White explained that a chapter 7 trustee would have a duty to sell the Debtor's assets and distribute the proceeds to his creditors.  Mr. White did not see any time-sensitivity to the filing and was unsure whether it would ever occur.  He advised the Debtor to delay filing and try to sell his assets in order to collect any equity in them, and the Debtor agreed to that course.  On two occasions, Mr. White and the Debtor executed fee agreements indicating that it appeared that the Debtor would have no reaffirmation agreements.

Discussions between the Debtor and Mr. White continued for many months.  Based on his communications with the Debtor, Mr. White did not believe that the Debtor or his dependents had ever lived at the Property.  Early discussions revealed that the Debtor wanted to sell the Property and that he had a listing agreement with a broker.  Mr. White did not ask for a copy of

that agreement because he thought any sale would close before the Debtor decided to move forward with the bankruptcy case.

After meeting with the Debtor in April 2018, Mr. White made a note indicating that the filing of the petition should be delayed pending the sale of the Property. The filing was also delayed while the Debtor paid Mr. White's fee in installments.

In July 2018, the Debtor entered into a listing agreement giving Century 21 North East the right to list and promote the sale of the Property until February 2019. The Debtor told Mr. White when he executed a first, and later a second, purchase and sale agreement with respect to the Property, but neither resulted in a sale. Mr. White never asked for copies of any listing agreements or purchase and sale agreements because he was uncertain whether the Debtor would choose to pursue bankruptcy relief if the Property sold and he thought that any sale would close before the Debtor would be ready to move forward with the bankruptcy case.

The Debtor's intentions with respect to the Property featured prominently in discussions between Mr. White and the Debtor during a meeting in September 2018. They reviewed the Debtor's efforts to sell the Property and his contacts with a realtor. They also discussed the option of trying to keep the Property in a chapter 7 bankruptcy through some combination of an abandonment by the trustee and a consensual loan modification. Mr. White secured the Debtor's signature on a statement acknowledging that he would probably be unable to keep any equity from the sale of the Property or the restaurant equipment. Mr. White also generated a draft of the schedules based on the information provided, reviewed them with the Debtor, and had the Debtor sign them. The draft set did not include a Schedule G, which would have disclosed any executory contracts. At or after the meeting, Mr. White made the following note to his case file: "hold until we confirm what happens on sale of house."

In mid-November 2018, frustrated with the failed efforts to sell the Property, the Debtor decided to move ahead with the bankruptcy case. Mr. White then reviewed the draft petition, schedules, and statements with the Debtor on the phone and sent those documents to the Debtor, who signed and dated them November 15. At this time, the Debtor was bedridden and in ill-health; he did not mail Mr. White the bankruptcy paperwork signed in mid-November until several days before the petition was filed, in mid-December.

In the meantime, on November 29, 2018, the Debtor executed a purchase and sale agreement, agreeing to sell the Property to a third party for $166,700. The Debtor intended to complete the sale if the buyer did not back out.

After Mr. White received the Debtor's bankruptcy paperwork in the mail, he prepared to file the petition and called the Debtor to see whether anything had changed since their last contact. During that call, Mr. White asked the Debtor whether he had sold the Property or whether he had any buyers. In response, the Debtor said that he was never going to sell the Property or make any money on the sale of the Property. On December 13, Mr. White started the Debtor's bankruptcy case, filing a petition, schedules, and statements containing the Debtor's electronic signature dated December 12, 2018. Mr. White did not have a copy of a petition or a set of schedules and statements actually signed by the Debtor on December 12, 2018; he was working with the set of documents that the Debtor had signed one month earlier.

On the petition, the Debtor indicated that he was a resident of East Boothbay, Maine, and Mr. White expressly certified, under 11 U.S.C. § 707(b)(4)(D), that he had "no knowledge after an inquiry that the information in the schedules filed with the petition [was] incorrect." On Schedule A/B, the Debtor identified himself as the sole owner of the Property, which he valued at $182,000. Although he did not reside there, the Debtor claimed an exemption in the Property

on Schedule C under Me. Rev. Stat. Ann. tit. 14, § 4422(1)(A).  On Schedule G, the Debtor represented that no executory contracts were in existence.  On the Statement of Intent, he indicated that he intended to retain the Property and enter into a reaffirmation agreement.

Mr. White felt that the Debtor's intentions with respect to the Property, as of the petition date, were "confused."  He understood that the Debtor wanted to sell the Property but had been unable to, and that he might be interested in keeping it, if feasible, through a combination of abandonment, reaffirmation, and loan modification.  Mr. White described these options as "speculative."  He was unaware that the Debtor had executed a purchase and sale agreement that was in effect on the petition date.

When he filed the petition on December 13, 2018, Mr. White also filed a form disclosing the compensation that the Debtor had agreed to pay him in exchange for his services in the case, including representation at the meeting of creditors.  Shortly before the case began, Mr. White informed the Debtor that he was going to be suspended from the practice of law on December 31, 2018.  Mr. White asked whether the Debtor wanted to pursue the case with someone else and whether the Debtor would consent to Molleur Law Office ("MLO") taking over as successor counsel, at no additional charge, after his suspension.  The Debtor decided to begin the case with Mr. White and consented to MLO's representation of him following Mr. White's suspension.  Mr. White withdrew from his representation of the Debtor on December 28, 2018.  MLO then entered an appearance on the Debtor's behalf and represented the Debtor at the meeting of creditors at no additional expense.

The sale of the Property closed on January 5, 2019, a few weeks after the bankruptcy case began.  The mortgage on the Property was paid off at closing.  The Debtor received no funds from the sale; instead, he contributed about $200 to facilitate the closing.

The Court bifurcated proceedings in this contested matter, conducting an evidentiary hearing regarding compliance with section 707(b)(4) and Rule 9011 on January 15, 2020, and reserving the question of sanctions for further proceedings. The facts set forth above are derived from the uncontested allegations found in the Trustee's motion, the evidence admitted during the hearing, and the inferences fairly derived from that evidence.

## DISCUSSION

"The content of a debtor's petition and schedules is relied on, and should have the quality to merit that reliance." Lafayette v. Collins (In re Withrow), 405 B.R. 505, 512 (B.A.P. 1st Cir. 2009) (quotation marks omitted). To enforce a measure of quality control, Rule 9011(b) imposes certain obligations on an attorney when presenting written papers to the court. Specifically, as relevant here, the Rule provides:

> **(b) Representations to the Court.** By presenting to the court (whether by signing, filing, submitting, or later advocating) a petition, pleading, written motion, or other paper, an attorney . . . is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, —
> . . .
> (2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law; [and]
> (3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery[.]

Fed. R. Bankr. P. 9011(b). Like Rule 9011, section 707(b)(4)(D) imposes certain obligations on an attorney who signs a bankruptcy petition:

> (D) The signature of an attorney on the petition shall constitute a certification that the attorney has no knowledge after an inquiry that the information in the schedules filed with such petition is incorrect.

11 U.S.C. § 707(b)(4)(D).  Although Rule 9011 and section 707(b)(4)(D) are not identical, they both aim to prevent lawyers from carelessly presenting unsubstantiated factual information and unsupported arguments to the court.  *See* Resurgent Capital Servs., L.P. v. Harrington (In re Cushman), 589 B.R. 469, 489 (Bankr. D. Me. 2018) (discussing Rule 9011).  To this end, an attorney who files schedules and statements on a debtor's behalf is under an affirmative duty to undertake an inquiry into the facts set forth in the schedules and statements before filing them, and to ensure that the representations in the schedules and statements are factually and legally justified based on the information obtained in that inquiry.  *See* In re Withrow, 405 B.R. at 512.  Under this standard, counsel is not a guarantor of the accuracy of the information contained in the schedules and statements.  In re Withrow, 391 B.R. 217, 227 (Bankr. D. Mass. 2008), *aff'd*, 405 B.R. 505.  Instead, an attorney is under a duty to perform an objectively reasonable investigation under the circumstances and to act upon any information revealed in that investigation.  *See* In re Withrow, 405 B.R. at 512.

      Here, the Trustee contends that Mr. White failed to meet the obligations imposed by Rule 9011(b) and section 707(b)(4)(D) in submitting Schedule C, Schedule G, and the Statement of Intent.  The Trustee also takes issue with Mr. White's agreement to represent the Debtor at the meeting of creditors, which became impossible for Mr. White to fulfill in light of his imminent suspension.  Because the Debtor chose to proceed with knowledge of Mr. White's impending suspension, and because Mr. White arranged for successor counsel to represent the Debtor at the meeting of creditors at no additional expense, the Court is untroubled by this aspect of Mr. White's agreed representation.  The other issues raised by the Trustee will be addressed in turn.

**I.     Schedule C**

On Schedule C, the Debtor claims an exemption in the Property under Me. Rev. Stat. Ann. tit. 14, § 4422(1)(A), which provides an exemption "in real or personal property that the debtor or a dependent of the debtor uses as a residence[.]" Id. By preparing and filing this document, Mr. White certified that: (i) the claimed exemption was warranted by existing law (or by a nonfrivolous argument for the extension of existing law); (ii) the claimed exemption was supported by some evidence (or was likely to be after further investigation); and (iii) he lacked knowledge, after an inquiry, that the information on Schedule C was incorrect.

Based on his discussions with the Debtor over the course of many months, Mr. White knew that the Debtor lived in the Boothbay region in the year and half leading up to the petition date, and he believed that neither the Debtor nor the Debtor's dependents had ever lived at the Property. None of the evidence suggests that the Debtor ever told Mr. White that he hoped to relocate to the Property, or that he had any plans or had made any preparations to move there at the time that the case began. There was no reasonable basis for Mr. White to believe that either the Debtor or his dependents lived in the Property or had any present intention to move to the Property such that the claimed residence exemption might be justified under any legal theory. Moreover, there was an obvious conflict between the residence exemption claimed on Schedule C and (i) the petition, which lists the Debtor's address in East Boothbay, and (ii) Schedule J, which does not list any dependents. Mr. White should have noted these discrepancies and taken corrective action before filing Schedule C. Mr. White has not identified any factual information, any law, or any nonfrivolous arguments for the extension of existing law that might support the claimed exemption. Based on the inquiry that he undertook and the facts in his possession, Mr. White knew or should have known that the information on Schedule C was not correct. By filing

the document regardless of this knowledge, Mr. White violated section 707(b)(4)(D) and Rule 9011(b).

### II. Other Issues Raised by the Trustee

Mr. White was obligated to undertake a reasonable inquiry as to the factual and legal matters set forth in Schedule G and the Statement of Intent before he filed them. By filing Schedule G, Mr. White certified to the Court that he lacked knowledge, after an inquiry, of any executory contracts in effect on the petition date. *See* 11 U.S.C. § 707(b)(4)(D). By filing the Statement of Intent, Mr. White certified that he believed, based on reasonable inquiry, that the Debtor intended to reaffirm the mortgage on the Property. *See* Fed. R. Bankr. P. 9011(b)(3). Mr. White was, in fact, unaware of the listing agreement and the purchase and sale agreement in effect on the petition date, and he believed that the Debtor might wish to reaffirm the mortgage on the Property in connection with a loan modification. This much is reasonably clear. Whether Mr. White undertook a reasonable prefiling inquiry as to the Debtor's intentions with respect to the Property and the existence of any executory contracts is less clear.

During their first meeting in 2017, Mr. White became aware that the Debtor had some ambivalence about his continued ownership of the Property. Mr. White's notes about the Property from that initial meeting—"Intent?"; "LeT GO"; "Keep"; and "?"—reveal no definite objectives. Later in the relationship, the Debtor's intentions crystallized, and he made efforts to sell the Property. In keeping with this tune, on the two occasions that the Debtor executed fee agreements for Mr. White's services, those agreements contemplated that no reaffirmation agreements would be filed. For many months, Mr. White's strategy remained constant; he was holding the filing of the bankruptcy petition pending the sale of the Property. The Debtor confirmed that course when he met with Mr. White in September 2018, reporting on his

continued efforts to sell the Property and his contacts with a realtor. During that same meeting, when discussing a potential chapter 7 case, Mr. White raised the possibility of trying to keep the Property following abandonment of the Property by the chapter 7 trustee.

Then, in mid-November 2018, the strategy changed and the Debtor, frustrated with his efforts to sell the Property, decided that he was ready to move forward with the bankruptcy case. At that point, when Mr. White reviewed the schedules and statements with the Debtor on the telephone, the Statement of Intent indicated that the Debtor intended to keep the Property and reaffirm the mortgage. That may have been the Debtor's intention in mid-November, and Mr. White may have confirmed as much during that phone call.[1]

The Debtor did not immediately mail Mr. White the paperwork that he signed in mid-November. It took him a few weeks to dispatch the documents. As such, Mr. White did not have copies of the petition, schedules, and statements signed by the Debtor in mid-December, even though he affixed the Debtor's electronic signature to the documents with a date of December 12. A certain amount of delay between the execution of schedules and statements and the filing of schedules and statements may be unavoidable; the Court is not insensitive to this reality. However, in this case, the delay of one month from the date that the Debtor signed the petition, schedules, and statements to the date that Mr. White filed those documents was simply

---

[1] The testimony during the hearing did not reveal the contents of that mid-November phone call. For example, whether Mr. White explained the meaning of the term "executory contract" is unclear. Similarly, the evidence did not reveal whether, in November 2018, Mr. White specifically asked the Debtor if he then had an active listing agreement for the Property.

- 10 -

too long.2  With the passage of time, things changed, resulting in unnecessary complications.

Even though the delay between the execution of the documents and the filing of the documents was attributable to the Debtor, it was incumbent upon Mr. White to determine whether the information in the schedules and statements was accurate at the time of filing.  To fulfill this obligation, Mr. White called the Debtor right before he filed the petition to see whether anything had changed since the Debtor executed the documents in mid-November.3  Although that call did not involve a line-by-line review, Mr. White specifically asked the Debtor whether he had anything pending on the sale of the Property, and the Debtor said no.  The Debtor's response was not accurate; at that time, he had both a listing agreement and a purchase and sale agreement in effect with respect to the Property, and he intended to sell the Property if the buyer did not back out.  Mr. White relied on the Debtor's inaccurate response when he filed Schedule G and the Statement of Intent.  Under the circumstances, that reliance was not unjustified.  Mr. White had no reason to believe that the Debtor would lie about the status of his efforts to sell the Property, and he understood that the Debtor had elected to pursue bankruptcy relief because he had been unable to sell the Property.  Mr. White could have asked more pointed

---

2 Although petitions, schedules, and statements are generally to be filed electronically, with the debtor's electronic signature, counsel must have the original, executed documents in counsel's possession.  *See* Bankr. Ct. D. Me. Administrative Procedures for Filing, Signing, Maintaining, and Verifying Pleadings and Other Documents in the Electronic Case Filing (ECF) System § II(D)(1).  Under the Court's Administrative Procedures, it was improper for Mr. White to affix the Debtor's electronic signature to the petition, schedules, and statements (with a date of December 12) one month after the Debtor himself executed the original version of those documents in mid-November.

3 The schedules filed in mid-December reported the same figures for cash on the Debtor's person and in his bank account as the schedules executed in mid-November.  It is reasonable to assume that the Debtor did not have the same amount of cash on his person and in his bank account in mid-November as he had in mid-December.  Mr. White recognized as much during the hearing but asserted that any differences were legally insignificant because the Debtor's income and assets were exempt.  The explanation may hang together, but it was not Mr. White's call to determine which aspects of the schedules were significant and which were not.  He was instead obligated to make reasonable efforts to determine whether the information on the schedules was accurate as of the petition date.

questions in an effort to verify that there were no executory contracts in existence, and that the Debtor remained committed in his intent to try to keep the Property in a chapter 7 case. At bottom, Mr. White's account of his prefiling phone call with the Debtor leads the Court to believe that he engaged in a reasonable inquiry, even if a better approach would have involved more specific questions to the Debtor about the current status of his efforts to sell the Property.

Like Mr. White, the Court has no reason to believe that the Debtor lied to Mr. White. Instead, it appears that the Debtor may have been confused and overwhelmed by other difficulties in his life. During the hearing on the Motion, the Debtor was confused about the dates of various events. He was also unsure whether he had ever told Mr. White about the purchase and sale agreement that resulted in the post-petition sale of the Property, testifying that he "believe[d]" he told Mr. White about the purchase and sale agreement. When that equivocal testimony is contrasted with Mr. White's more definitive account of his call with the Debtor in mid-December, the Court infers that the Debtor was ultimately responsible for the inaccurate representations on Schedule G and the Statement of Intent. Although Mr. White could likely have done more earlier in his relationship with the Debtor to determine whether there was an active listing agreement, he did not act unreasonably in delaying those efforts until the Debtor was ready to move forward with the case. At that point, when the Debtor was ready to file, Mr. White did not act unreasonably by relying upon his client's representations that there was no sale pending, and that he had no buyers.

## CONCLUSION

In this case, the Trustee has met his burden of establishing that Mr. White did not comply with Rule 9011 and section 707(b)(4)(D) as to Schedule C. As a sanction for this shortcoming, the Trustee has asked the Court to order Mr. White to disgorge his fees in this case, to award the

Trustee's costs in bringing the Motion, and to impose further unspecified sanctions as appropriate. The Court will conduct further proceedings on the issue of whether Mr. White's violation of Rule 9011 and section 707(b)(4)(D) merit sanctions and, if so, the propriety of sanctions, including but not limited to, the particular sanctions sought by the Trustee. A separate order will issue outlining the course of those proceedings.

Dated: March 24, 2020

Michael A. Fagone
United States Bankruptcy Judge
District of Maine